MARY A. BRENNAN, administratrix, *vs.* MARY A. W. KEENE.

Suffolk.    January 11, 12, 1921. — March 3, 1921.

Present: RUGG, C. J., DE COURCY, CROSBY, PIERCE, & JENNEY, JJ.

*Negligence,* Of one owning or controlling real estate.    *Evidence,* Presumptions and burden of proof.

A verdict for the plaintiff in an action of tort by the administrator of the estate of a police officer against the owner of a house for causing personal injuries to and the death of the plaintiff's intestate through leaving open and unguarded a hatchway in a vacant store in violation of St. 1909, c. 514, § 96, is not warranted where the evidence tends merely to show that the intestate, a "strapping young man" six feet in height, in the performance of his duty tried the outer door of the store, found it not properly secured, and entered the store; that he fell through an opening in the floor three feet square, a trap door opening which had been opened at some time before he fell, and struck on the back of his head, fracturing his skull; and where there is no evidence tending to show that the trap door was opened when the intestate entered the store.

TORT, by the administratrix of the estate of Michael Brennan against the owner of premises numbered 302 Warren Street in Boston for causing personal injury to and the death of the intestate, the plaintiff alleging in the declaration that her intestate was a police officer in the city of Boston, that it was his duty to patrol in the night time the vicinity of 302 Warren Street; that while so patrolling and acting under a rule of the police department and of his superior officers making it his duty to enter in the night time stores and premises the doors of which he found open, he found the doors of the premises or store or mercantile establishment numbered 302 Warren Street open, entered the premises and had just crossed the threshold when he was pre-

cipitated down an open well; that the "defendant was negligent and careless in allowing said door of her premises to be open and said hatch-way or open well to exist unless such hatch-way was provided with and protected by a good and substantial railing and such good and sufficient trap doors with which to close the same and keeping such trap doors closed except when in actual use by the occupant or occupants of the building having the use and control of same, according to" R. L. c. 104, § 43, "and the amendments thereto." Writ dated April 24, 1919.

In the Superior Court, the action was tried before *Bell,* J. Material evidence is described in the opinion. At the close of the evidence, the defendant moved that a verdict be ordered in her favor. The motion was denied. Subject to exceptions saved by the defendant, the judge submitted special questions to the jury, which, with the answers thereto, were as follows:

"1. Was or was not the accident, if any, caused by the fall through the trap door?" The jury answered, "Yes."

"2. Was or was not the rear door of 302 Warren Street open immediately before the accident, if any?" The jury answered, "Yes."

"3. Was or was not the cover of the trap door off immediately before the accident, if any?" The jury answered, "Yes."

"4. Ought or ought not the unfastened condition of the rear door to have been known to and remedied by the defendant before the accident, if any?" The jury answered, "Yes."

"5. Ought or ought not the fact that the trap door was open before the accident, if any, to have been known to and remedied by the defendant?" The jury answered, "Yes."

"6. Was or was not the deceased in the performance of an official duty when injured?" The jury answered, "Yes."

"7. Was or was not the deceased in the exercise of active care for his own safety?" The jury answered, "Yes."

"8. Did or did not the deceased experience conscious suffering after the accident, if any?" The jury answered, "Yes."

"9. If the jury answer the last question in the negative, they need not answer this. If they answer it in the affirmative, what sum is a fair and just sum for such suffering?" The jury answered, "$2,000."

"10. If the defendant is liable for the accident, what sum do

the jury assess as a fair penalty, determined by reference to the degree of the defendant's culpability?" The jury answered, "$5,000."

Upon the answering of the special questions, the judge, subject to exceptions saved by the defendant, ordered a verdict for the plaintiff on a count for conscious suffering in the sum of $2,000, and upon a count for causing death for $5,000, and, later, upon a motion of the defendant, reduced such verdicts to $1,000 and $2,500, respectively. The defendant alleged exceptions.

*G. Gleason,* for the defendant.

*H. A. Kenny,* for the plaintiff.

PIERCE, J. This was an action of tort brought by the administratrix of the estate of Michael Brennan, to recover for his conscious suffering and death alleged to have resulted from the negligence of the defendant. At the close of the evidence the defendant moved that a verdict be ordered for the defendant. The trial judge denied the motion, and submitted ten interrogatories to the jury. The defendant duly excepted to the denial of the motion and to the submission of the interrogatories. The jury answered each of the submitted questions in the affirmative, assessed the damages, and found for the plaintiff in each count by order of the judge. The defendant duly excepted to the order of the judge; she also excepted to the judge's refusal to give certain rulings and to certain parts of the charge.

The undisputed reported evidence is that the intestate was a "strapping young man" six feet in height, "and a police officer" connected with Station 9 of the city of Boston. At eight o'clock on the morning of July 4, 1918, he was seen in an alleyway which extends from Clifford Street in the rear of houses on Warren Street, "sitting on the steps leading up to the upstairs in the rear of his [the witness's] house" numbered 314 Warren Street. Ten minutes later he was again seen by the same witness, "sitting on the entrance going down into the cellar" of the same premises. He was very sallow and pale, was holding his head, was in his shirt sleeves, had on an unbuttoned vest, and trousers that hung down with a substance upon them evacuated from his bowels. He took hold of the arm of the witness, when that person tried to arouse him, mumbling something, "stairs" or "cellar." He was taken in an unconscious state to the Boston City Hospital,

and died there on July 7, 1918, so far as appears without regaining consciousness.

It is the contention of the plaintiff that the injury to and death of the intestate were the result of a fall down a trap door hole in a vacant store, owned by the defendant, at No. 302 Warren Street. The medical examiner of Suffolk County made an autopsy on the body. In substance he testified he found that the injury sustained by the intestate would be consistent with a fall from a height, striking on the back of the head; that the intestate had a fractured skull; that the cause of death was the fracture of the skull and the injury to the brain; that there were no marks of violence on the face; that there was no break in the scalp; that the fracture was so extensive that it could have been produced only as the result of great violence; that ordinary violence would not produce this very extensive fracture; that an ordinary fall, or even an assisted fall — if he were knocked down on the street — would not produce such a fracture; that such a fracture could be produced only by a fall from a considerable height; that this type of fracture could not be received if the person was walking along and fell over; that the intestate must have been precipitated almost head first and landed on the back of his head; and that if he landed on his feet and then fell over, that fall would not be sufficient to produce such a fracture. He further testified that people with fractured skulls react very differently; that a good many men are rendered unconscious and remain so, and others pick themselves up and go through a lot of apparently conscious actions; and that it would be possible for a man with a fractured skull to grope along for several hundred yards.

The vacant store above referred to was one of two stores, which with a real estate office covered the entire ground floor of a building owned by the defendant. The stores, which had been vacant seven months, and the real estate office, were numbered respectively 300, 302 and 304 Warren Street. The building occupies a lot of land at the corner of Warren and Clifford streets, with entrances to the stores on both of those streets. The entire second and third stories were occupied as tenements. The evidence does not furnish the dimensions of the vacant store numbered 302 Warren Street, but discloses that in the floor in the rear of that store there is a hoistway with a trap door, three feet long and

three feet wide, distant two to six feet from the rear door on Clifford Street. It also discloses that on the left of the rear room as one enters from Clifford Street, a stairway, without gate or rail, next to the wall leads down to the cellar. The rear door leading to Clifford Street had a bolt on it, and there was also a key to it. The doorway in the rear of the vacant store is the first doorway on Clifford Street from Warren Street. The distance from this doorway to the entrance to the passageway on Clifford Street is seventy-two feet; and the distance along the passageway in the rear of the house on Warren Street is one hundred and eight feet. The passageway is twelve inches higher than the sidewalk, and there is a vacant lot adjacent to the passageway five feet below the sidewalk, which is reached by six wooden steps. A witness testified that the rear door of the store was open at about 7 P. M. on July 3, 1918.

Another witness testified that while standing at the corner of Warren and Clifford streets, between three and four o'clock of the morning of July 4, 1918, he saw "a police officer come along, try a door and step inside; that he did not see the police officer come out." A witness testified that in the afternoon two or three days after July 4, 1918, he went into the store and saw a police officer's coat lying beside the trap door; that he went out and brought a police officer back with him; that the police officer went down stairs and returned with an officer's helmet and billy. The police officer who was brought into the store by the preceding witness corroborated the testimony of that witness, except that he thought, "he was n't sure," the time they entered the store was on the afternoon of July 4, 1918. He further testified that the trap door was off; that the police officer's blouse was lying on the cover; that he found the helmet and a short stick underneath the open trap door; that the helmet was crushed together; that the helmet was in cone shape with the pointed part up, and that it was a regular police helmet. There was evidence that two or three days after the accident a police officer found a revolver near some bushes in the vacant lot. There was also evidence that police officers carried revolvers at that time; but there is no evidence that the intestate had a revolver when found on the morning of July 4, 1918.

On the foregoing facts, and such sensible inferences as may be

drawn therefrom, the jury circumstantially could warrantably find, with a reasonable probability of actual fact, that the blouse, the helmet and the revolver were the property of the intestate. They could also find, with a like probability of fact, that the rear door of the vacant store was open at seven o'clock on the night of July 3, 1918; that the police officer whose turn immediately preceded that of the intestate found the door open, and closed it in partial obedience to the police manual Rule 25, § 24, which reads so far as it is material as follows: "He shall examine in the night time all doors, gates and windows of dwellings and stores to see that they are properly secured, and if not, give notice to the inmates, if any. When the buildings are unoccupied, he shall first make fast all doors and windows found open and then notify the station house at once." They could also find with like reasonable probability that the intestate was the officer who was seen to "try a door and step inside;" and that the door referred to was the rear door to the vacant store. They could also find with like probability that the intestate tried the door and stepped inside, in the performance of his duty under § 24 of Rule 25 of the police manual.

There is no evidence to justify a finding that the intestate officer entered the vacant store because his suspicion was aroused that the premises had been burglariously opened and entered, that criminals were present therein, and that it was his duty to apprehend and arrest such persons, if found, as well as to secure the building.

His common law legal rights to recover from the owner of the premises for injuries caused by defects, were those of a person who enters under a license conferred by law, and not those of a person who enters by invitation express or implied. In such a case the owner owes no duty, except to abstain from positive wrongful acts which foreseeingly may result in an injury to such a person. And other than that element of protection the licensee takes all risk as to the condition of the premises upon which he enters. *Reardon* v. *Thompson,* 149 Mass. 267. *Creeden* v. *Boston & Maine Railroad,* 193 Mass. 280.

The plaintiff, however, puts her right to recovery upon an alleged violation of R. L. c. 104, § 43, inadvertently overlooking, we assume, the fact that that chapter and section were repealed

and re-enacted without change by St. 1909, c. 514, §§ 96, 145. St. 1909, c. 514, § 96, reads: "The openings of hoistways, hatchways, elevators and well holes upon every floor of a factory or mercantile or public building shall be protected by sufficient trap doors or self-closing hatches and safety catches, or such other safeguards as the inspectors of factories and public buildings direct; and due diligence shall be used to keep such trap doors closed at all times, except when in actual use by the occupant of the building who has the use and control of the same." The vacant stores fall into the class denominated a mercantile building, if that name can be rightly applied to a building constructed, but not then "used for the purposes of trade in the purchase or sale of any goods or merchandise." See St. 1909, c. 514, § 17. We assume, without decision, that the vacant stores constituted a mercantile building within the meaning of the statute. We also assume, without discussion, on the authority of *Parker* v. *Barnard*, 135 Mass. 116, that the statute was intended for the protection of all who should be in the building in the lawful performance of their duties, and that the policeman, when he entered the building where he was injured, was in the class of persons so protected. If the intestate was in the building in the performance of his duty, we also assume the jury could find, with the aid of St. 1914, c. 553, that he was in the exercise of due care.

The difficult question is to determine with any degree of reasonable probability what the intestate was doing and what he was about after he entered the store. There is no evidence that he entered to protect the property from fire, to arrest criminals supposed to be therein, or otherwise than to fasten the door. The presence of his blouse by the side of or on the top of the removed trap door throws no light on his purpose in entering the room or in moving about within it. A still more difficult question to answer with reasonable probability of fact, as distinguished from possibility or conjecture, is whether the trap door was open or closed when the intestate entered. There is no evidence when it had been opened before the intestate entered, or by whom it was opened. In the field of pure speculation one conjecture may be as near to truth as any other. If we assume the trap door was open, it is impossible reasonably to see how a man six feet in height could step in the darkness of the night in a hole in the floor three

feet long by three feet wide, in such a way that he landed on the back of his head. In the absence of evidence that the trap door was open when the intestate entered, it is manifestly impossible to charge the defendant with any want of due diligence in keeping it closed.

It results that it was error to refuse the motion to direct a verdict for the defendant; that the exception thereto must be sustained; and that judgment may be entered for the defendant under G. L. c. 231, § 122.

*So ordered.*